## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| JESSICA PARM on Behalf of Herself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> NATIONAL BANK OF CALIFORNIA, N.A., <br><br> Defendant. | **CIVIL ACTION NO.**  4:14-cv-320-HLM <br><br> **CLASS ACTION COMPLAINT** <br><br> **RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT** <br> **JURY TRIAL DEMANDED** |

Plaintiff Jessica Parm individually and on behalf of the Class described below, by her attorneys, makes the following allegations based upon information and belief, except as to allegations specifically pertaining to Plaintiff and her counsel, which are based on personal knowledge.

### NATURE OF THE ACTION

1.     Plaintiff bring this class action against Defendant National Bank of California, N.A. ("NBCal" or "Defendant") to recover damages and other relief available at law and in equity on behalf of herself as well as on behalf of members

of the class who have been injured by Defendant's participation in a scheme to allow illegal online payday lenders access to the nation's secure electronic payment transfer network known as the "ACH Network" or "Automated Clearing House" to collect unlawful debts in violation of 18 U.S.C. § 1962 and the law of numerous states, including Georgia.

2.     This is a civil action seeking monetary damages, restitution, and declaratory and injunctive relief from Defendant, arising from its participation in schemes to collect on "payday loans" in states that have made payday loans unlawful.

3.     Payday loans—small loans due in full on the borrower's next "payday"—have a long and sordid history.  For years, unscrupulous lenders have taken advantage of desperate borrowers who are unable to obtain funds anywhere else in order to make ends meet, by offering loans at usurious and unconscionable rates.  Payday lenders operate on the shadowy fringe of the mainstream financial system.

4.     At least thirteen states across the nation have either banned payday loans directly or effectively banned them by operation of an interest rate cap.  Payday loans are illegal in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, and West Virginia (the "banned states"), and the District of Columbia.

5.     Certain payday lenders, many of which are purportedly located on Indian reservations make use of the Internet to circumvent these prohibitions and offer payday loans to borrowers residing in these states while ignoring the laws prohibiting those very loans (the "Illegal Payday Lenders").  These loans ("Illegal Payday Loans") feature interest rates of 400%, 500%, and higher.

6.     Illegal Payday Lenders' loan agreements with the borrowers often include an authorization allowing the illegal lender to "initiate" ACH transactions on the borrower's behalf.  This authorization to "initiate" only allows a lender to *make a request* to an ACH Network member bank to be allowed entry to the ACH Network. The lender cannot "initiate" an entry into the secure ACH Network on its own.

7.     The rules and regulations governing the ACH Network require that an ACH Network member bank enter into a written agreement with merchants, like the Illegal Payday Lenders, who seek to initiate credits and debits electronically.  This agreement describes in detail the scope of the relationship between the parties and has very specific requirements about what each party can and cannot do, as discussed further below

8.     Because the Illegal Payday Lenders cannot introduce credit and debit entries into the network on their own, Illegal Payday Lenders' ability to defy the law of thirteen states rests on the cooperation of financial institutions like NBCal that knowingly enter into these written contracts with Illegal Payday Lenders and then

"originate" debits and credits from borrowers' bank accounts on the ACH Network. These banks, known as Originating Depository Financial Institutions ("ODFIs") are the Illegal Payday Lenders' sole access point to the ACH Network—without this small group of banks willing to work with the Illegal Payday Lenders, the lenders' credit and debit entries cannot enter the secure ACH Network.

9.    Indeed, it would be impossible for Illegal Payday Lenders to deposit payday loan proceeds or debit payday loan payments from customers' bank accounts in states where the loans are illegal and unenforceable without Defendant's willingness to allow the Illegal Payday Lenders to access the ACH Network.

10.    NBCal, acting as an ODFI, actively participated in this unlawful scheme by granting Illegal Payday Lenders' requests to "initiate" ACH entries representing payday loan credits and debits to and from borrower checking accounts, and knowingly taking the affirmative steps to "originate" these illegal entries into the ACH Network, thereby enforcing debts NBCal knew to be unlawful.

11.    NBCal knew that it was crediting and debiting borrowers' accounts for unlawful purposes because it was required to undertake extensive due diligence procedures on all merchants attempting to initiate credit or debit entries on the ACH Network before entering into contractual arrangements with them that allowed access to the ACH Network.  Indeed, ODFIs like NBCal are required by federal banking regulations and the rules of the ACH Network to know the identities of the entities

4

for which they originate transactions and to assure themselves that such transactions do not violate state or federal law.

12.   NBCal knew that it was acting at the request of Illegal Payday Lenders and that the entries it originated on the ACH Network at the request of such Illegal Payday Lenders would credit or debit funds in states in which the Illegal Payday Lenders' loans were illegal and unenforceable.

13.   NBCal's illegal schemes with Illegal Payday Lenders have victimized Plaintiff and thousands of others.  Unless enjoined, NBCal will continue to engage in these schemes and cause substantial injury to borrowers.

## PARTIES

14.   Plaintiff Jessica Parm ("Parm") is a citizen and resident of LaFayette, Georgia.

15.   Defendant NBCal is a national banking association incorporated in the State of California with main offices at 12121 Wilshire Blvd., 14th Floor, Los Angeles, California.

## OTHER ENTITIES

16.     Western Sky Financial, LLC ("Western Sky") is a South Dakota limited liability company with its principal place of business at 612 E Street, Timber Lake, South Dakota.  Western Sky advertised and offered payday loans to consumers through the Internet website www.westernsky.com.  It is owned by a member of the

Cheyenne River Sioux Indian Reservation, but is not owned or operated by a tribe or tribal entity.  It purports that loans made in its name are subject only to the laws of the Cheyenne River Sioux Indian Reservation.

17.    CashCall, Inc. ("CashCall") is a California corporation, with its principal place of business at 1600 S. Douglass Road, Anaheim, CA 92806.  As a significant part of its business, CashCall services and collects consumer-installment loans.

18.    Beginning in late 2009, CashCall and its wholly owned subsidiary, WS Funding, entered into an arrangement with Western Sky to make high-cost, consumer-installment loans that – purportedly – did not have to comply with state law ("WS Loans").  WS Loans, though made in Western Sky's name, were marketed by CashCall, financed by WS Funding, almost immediately sold and assigned to WS Funding, and then serviced and collected by CashCall and/or another affiliated debt-collection company Delbert Services Corporation.

19.    Between early 2010 and late 2013, thousands of WS Loans were made to borrowers nationwide, including to borrowers in the banned states.

20.    WS Loans ranged from $850 to $10,000.  They carried upfront fees, lengthy repayment terms, and annual percentage rates (APRs) ranging from 89.68% to 342.86%.  The precise terms evolved over the life of the program and varied based on the amount of the loan.

21.     WS Loan borrowers, including those in the banned states, were required electronically to sign a standardized loan agreement.  The agreement contained, among other terms:

     a.  a purported obligation "to pay to the order of Western Sky or any subsequent holder of this Note the sum of [amount of the loan proceeds], together with interest calculated at [interest rate] % per annum and any outstanding charges or late fees, until the full amount of this Note is paid;" and

     b.  a purported authorization, or acknowledgement of an alleged prior authorization, for the holder of the note to debit from the borrower's bank account a specified monthly installment amount, which includes principal, interest, and fees.

22.     In numerous instances, Western Sky unlawfully conditioned the extension of credit on recurring preauthorized electronic fund ACH transfers.

23.     WS Loans were made, serviced, and collected through interstate commerce.  Yet the loan agreement asserted that "[n]either this Agreement nor Lender is subject to the laws of any state of the United States of America," and that:

> This Loan Agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation.  By executing this Loan Agreement, you, the borrower, hereby acknowledge and consent to be bound to the terms of this Loan Agreement, consent to the sole subject matter and personal

jurisdiction of the Cheyenne River Sioux Tribal Court, and that no other state or federal law or regulation shall apply to this Loan Agreement, its enforcement or interpretation.

You further agree that you have executed the Loan Agreement as if you were physically present within the exterior boundaries of the Cheyenne River Indian Reservation a sovereign Native American Tribal Nation; and that this Loan Agreement is fully performed within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation.

24.    Neither Western Sky nor CashCall is owned or operated by a tribe or tribal entity.  WS Loan borrowers did not enter tribal lands in applying for, receiving, or paying WS Loans.  Rather, borrowers applied for and received their WS Loans in the states where they lived.  And borrowers' payments on WS Loans were taken from bank accounts held by borrowers in the states where they lived.

25.    The standard WS Loan agreements also contain an arbitration provision which provides that "any dispute you have with Western Sky or anyone else under this loan agreement will be resolved by binding arbitration . . . which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement."

26.    As recognized by this Court and others, the forum-selection clauses contained in the WS Loan agreements are "blatantly false" and were included in the agreements "as a result of fraud and overreaching" and "not the product of arms'-

length negotiations."[1]  Moreover, the clauses were included in the agreements "in bad faith--as a means of discouraging borrowers from pursuing legitimate claims or as a means to escape regulation by state agencies."[2]  As the New Hampshire Banking Department observed, "it appears that Western Sky is nothing more than a front to enable CashCall to evade licensure by state agencies and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators."[3]

27.   With respect to the arbitration provision, the purported tribal arbitral forum and governing rules do not exist now and did not exist at the time the agreements were electronically signed.  As this Court concluded, "[the Cheyenne River Sioux Tribal Nation] consumer dispute rules do not exist, the arbitral forum is unavailable, and the arbitration provision is unenforceable."[4]  Likewise, the U.S. Court of Appeal for the Seventh Circuit adopted findings of fact from the U.S. District Court for the Northern District of Illinois indicating that the arbitration

---

[1] *Parnell v. CashCall, Inc*., No. 4:14-cv-00024-HLM, slip op. at 32-33 (N.D.G.A. May 12, 2014).

[2] *Id*. at 34-35.

[3] *Id*. at 35.

[4] *Id*. at 75. *See also Inetianbor v. CashCall, Inc*., 768 F.3d 1346, 1356 (11th Cir. 2014) (Restani, J., concurring) (interpreting the sane agreement and declining to enforce the arbitration provision because "[a]t the time the parties signed the agreement to arbitrate, the [Cheyenne River Sioux] Tribe did not have consumer dispute rules and did not involve itself in private arbitration").

provision in a similar agreement was "merely an attempt to escape otherwise applicable limits on interest charges." The Court noted that "the promise of a meaningful and fairly conducted arbitration is a sham and an illusion."[5]

28. Moreover, the loan agreement violates OCGA § 16-17-2(c)(1), which provides *inter alia* that:

> A payday lender shall not include in any loan contract made with a resident of this state any provision by which the laws of a state other than Georgia shall govern the terms and enforcement of the contract, nor shall the loan contract designate a court for the resolution of disputes concerning the contract other than a court of competent jurisdiction in and for the county in which the borrower resides or the loan office is located.

29. The loan agreement also violates OCGA § 16-17-2(c)(2), which provides that:

> An arbitration clause in a payday loan contract shall not be enforceable if the contract is unconscionable. In determining whether the contract is unconscionable, the court shall consider the circumstances of the transaction as a whole, including but not limited to:
>
> (A) The relative bargaining power of the parties;
>
> (B) Whether arbitration would be prohibitively expensive to the borrower in view of the amounts in controversy;
>
> (C) Whether the contract restricts or excludes damages or remedies that would be available to the borrower in court, including the right to participate in a class action;

---

[5] *See Jackson v. Payday Financial, LLC*, 764 F.3d 765, 778 (7th Cir. 2014).

(D) Whether the arbitration would take place outside the county in which the loan office is located or any other place that would be unduly inconvenient or expensive in view of the amounts in controversy; and

(E) Any other circumstance that might render the contract oppressive.

30.     Shortly after WS Funding acquired a WS Loan, CashCall provided notice of the assignment to the borrower by email or letter.  This notice generally explained that "[e]ffective today, your loan is now owned by WS Funding, LLC" and that "CashCall was recently assigned your loan for servicing."  The notice also informed the borrower that "[g]oing forward, CashCall will handle the servicing of your loan, which means collecting your payments and handling related issues" and that "you will now be making all of your payments, including your first payment, to CashCall."

31.     CashCall then engaged in collection activity on WS Loans, including those made to borrowers in the banned states:

> a.   CashCall sent borrowers billing statements that identified the amounts and dates of debits that CashCall would be extracting from the borrowers' bank accounts through ACH transactions;
>
> b.   Beginning on the first payment date and then monthly, CashCall debited the loan payments from the borrowers' bank accounts.

Interest and other loan fees were typically a substantial part of each

installment payment; and

c.   When borrowers became delinquent or refused to pay further on the loans, CashCall demanded loan payments through repeated calls, letters, and other communications.

32.   CashCall did not disclose to borrowers in the banned states that their loans were void or that, under applicable state laws, they were not obligated to make some or all of the payments.

33.   To the contrary, in calls, letters, and other communications, CashCall referred borrowers back to their loan agreements with Western Sky, which affirmatively represented that the loans were not subject to any state's law, and then used the borrower's purported ACH authorization directly to debit illegal loan payments directly from the borrowers' accounts.

34.   Western Sky, CashCall and their affiliated entities caused substantial financial injury by debiting money from borrowers' accounts which Western Sky, CashCall and their affiliated entities were and are not legally entitled to collect, and that borrowers were and are not obligated to pay.

35.   Since 2010, at least eleven states, including Georgia, the Consumer Finance Protection Bureau ("CFPB"), and the Federal Trade Commission ("FTC") have taken action against Western Sky or its affiliated entities for unlawfully making

loans without proper state licensure and in violation of state usury laws, for misrepresentations, and/or for illegal debt collection practices.

36.    Of course, none of this would have been possible without ODFI banks such as NBCal who were willing to participate in and profit from the unlawful scheme by providing Western Sky, CashCall and their affiliated entities access to the ACH Network.

37.    At all times relevant hereto, Western Sky, CashCall and their affiliated entities (including WS Funding) engaged in the practice of making and did make illegal payday loans to persons residing in the banned states and the District of Columbia where such loans are prohibited outright.  Western Sky, CashCall and their affiliated entities are in the business of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

   (A)   unenforceable because of state or federal laws against usury;

   (B)   incurred in connection with the business of lending money at an usurious rate; and

   (C)   the usurious rate was at least twice the enforceable rate.

## JURISDICTION AND VENUE

38.    Plaintiff brings this action pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1964(c) and (d), which confers jurisdiction upon this Court over the subject matter of this action.  This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers

original jurisdiction upon this Court in a civil action arising under federal law. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

39.    Alternatively, this Court has jurisdiction under 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because this lawsuit has been brought as a class action, the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and one or more of the members of the putative Class is a resident of a different state than Defendant.

40.    This Court has personal jurisdiction over every Defendant pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1965.

41.    Alternatively, this Court has personal jurisdiction over NBCal pursuant to O.C.G.A. §9-10-91(2) in that NBCal personally or through an agent committed torts outside the state, causing injury to persons within the state, and should have reasonably expected its tortious acts to have consequences in the state and also derives substantial revenue from services rendered in the state or derives substantial revenue from interstate or international commerce.

42.    Venue is proper in the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred here and because NBCal is subject to personal jurisdiction here.

## BACKGROUND FACTS
### Payday Loans

43.    A payday loan is a short-term (typically a matter of weeks) high fee, closed-end loan, traditionally made to consumers to provide funds in anticipation of an upcoming paycheck.  A borrower obtaining an online payday must sign an ACH authorization agreement which purports to give the lender authority to electronically debit and credit loan transactions. To use the ACH Network, however, the lender must find an ODFI Bank that is member of the ACH Network and willing to accept the lender's requests to "initiate" credit and debit entries on the loan.  The ODFI is supposed to engage in extensive due diligence procedures prior to entering into an agreement with a merchant seeking to use the ACH Network to electronically process transactions.

44.    Only after the ODFI bank agrees that the merchant and its initiated entries are in full compliance with the ACH Network rules and state and federal law may it "originate" the entries into the secure ACH Network where the funds are electronically credited to or debited from the borrower's bank account.  The ODFI banks serve as the bridge that connects the lender to the ACH Network and allows the lender, working through its specific ODFI bank(s), electronically to debit the borrower's deposit account for the loan payment amounts and associated fees. Without an ODFI bank's active participation to grant the lender's request to "initiate"

debit entries and "originate" those entries into the ACH Network—the lender cannot reach the borrowers' account.

45.     Payday loans target the most vulnerable and desperate of borrowers, who might not qualify for a conventional unsecured loan or who are in such desperate need of cash that they cannot wait for the formal approval process that a conventional unsecured loan requires.

46.     Payday loans feature exorbitant interest rates (sometimes misleadingly referred to as "fees") and require "balloon" repayments shortly after the loan is made.

47.     The lenders engage in deceptive practices to ensure that the loan is never paid off.  Specifically, the lenders represent to borrowers that the total payment for satisfying the payday loan is the sum of the principal borrowed plus a one-time stated finance charge.  In reality, the lenders continuously debit purported "finance" charges from borrowers and do not apply those funds to the principal of the loan.  It is the rare instance that a borrower is actually debited in accordance with the already-astronomical terms stated in the payday loan agreement.

48.     To ensure the loans are never paid off (or, at least, last longer than their stated terms), payday lenders routinely "roll over" the borrower's loan balance without first securing affirmative consent to do so.  Over 75 percent of payday loan volume is the result of "churn"—borrowers having to take out additional loans to pay

off the original debt.  For this reason, borrowers are frequently charged substantially higher interest rates than the terms stated in the agreement.

49.    For these and other reasons, Georgia, twelve other states and the District of Columbia have outlawed payday loans.

50.    In Georgia, a transaction is civilly usurious when it imposes an annual interest rate exceeding 16% per annum for loans with a principal amount of less than $3,000.  O.C.G.A. §7-4-2.  By statute, a usurious loan is void and unenforceable, and the borrower is relieved from the obligation to repay both the principal and any accrued interest.  Further, loans with an interest rate exceeding 5% per month are criminally usurious in Georgia under O.C.G.A. §7-4-18.

51.    Illegal Payday Lenders, while not permitted to operate in the banned states and the District of Columbia, have simply moved to the Internet in order to solicit desperate borrowers in the banned states and the District of Columbia into illegal loans using an online application process.  This scheme could not have been accomplished without the complicity of ODFIs like NBCal who provide Illegal Payday Lenders with access to the ACH Network.

### The ACH Network

52.    The ACH Network is a processing system in which financial institutions accumulate ACH transactions throughout the day for later batch processing.  Instead of using paper to transmit transaction information, such as with checks, ACH

Network transactions are transmitted electronically, allowing for faster processing times and cost savings.

53.     The rules and regulations that govern the ACH network are established by NACHA (formerly the National Automated Clearing House Association) and the Federal Reserve.   NACHA manages the development, administration, and governance of the ACH Network.

54.     The *NACHA Operating Rules* are an extensive set of rules and regulations that govern and provide ACH Network participants with the operational framework for the ACH Network.   The *NACHA Operating Guidelines* provide guidance on implementing the Operating Rules (the NACHA Operating Rules & Guidelines collectively referred to herein as "NACHA Rules").   According to its introduction, the NACHA Rules "serve[] as the definitive source of information governing the exchange and settlement of electronic fund transfers through the ACH Network."

55.     An ACH transaction takes place in many steps and, under the NACHA Rules, entries may be rejected at any point if they are not in compliance with the NACHA Rules or are illegal under federal or state law.   The first step is having a merchant, in this case the Illegal Payday Lenders, receive authorization from a party (in this case the borrower) to initiate credits or debits on the ACH Network—typically styled as an "Authorization to Initiate ACH Transactions."   This authorization allows

the merchant to take the next step in the process, which is to find an ODFI bank participating in the ACH Network that is willing to enter into a separate written contract with the merchant to "originate" the lender's request to "initiate" credit or debit entries into the network.  Although it is the party "initiating" entries, merchants like Illegal Payday Lenders are known as "Originators" under the NACHA Rules (and are referred to as "Originators" herein) even though the ODFI banks are the parties tasked with "originating" the credit or debit entries "initiated" by the Originators.

56.     Under the NACHA Rules, Originators like the Illegal Payday Lenders do not have the ability to introduce a debit entry into the ACH Network on their own. Originators can only make a request to "initiate" a debit entry to the specific ACH member ODFI bank or banks with which it has entered into a contractual relationship to grant them access to the ACH Network.  Because ODFI banks are tasked with this important "gatekeeping" function, however, the ODFI banks are required to fully audit and vet the Originator's business to ensure it complies with NACHA Rules, and state and federal laws before entering into a contractual arrangement with that Originator.

57.     If the ODFI is satisfied that the Originator (here the Illegal Payday Lender) is in compliance, it may, pursuant to its agreement with the Originator, transmit ("originate") the ACH debit or credit to a pass-through clearing house known

as an "ACH Operator."  Under the NACHA Rules, the ACH Operator processes entries between the ODFI and the accountholder's bank, known as the Receiving Depository Financial Institution ("RDFI").  The RDFI is also a member of the ACH Network, and is the entity that actually makes the credit or debit on its customer's checking or savings account.

58.    Also active on the ACH Network are "Third Party Service Providers" which are entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.  A "Third-Party Sender" is a type of Third Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator.  An ODFI's obligations are the same whether it originates for an Originator directly, or for a Third-Party Sender acting on behalf of an Originator.

59.    The NACHA Rules specifically require all parties involved in the processing of ACH transactions to adhere to all state and federal laws in the United States.  These requirements are meant to keep illicit and unlawful transactions out of the ACH Network.

60.    The NACHA Rules require all participants in the ACH Network to perform risk-based due diligence and monitoring for unlawful transactions and

merchants.  The following Policy Statement was adopted by the NACHA Board of

Directors on August 22, 2002:

> Fraud and various forms of financial abuse have found their
> way into every facet of the U.S. payment systems.  The
> NACHA Board believes that the Automated Clearing
> House Network must maintain the highest standards of
> fraud prevention to retain the integrity of the payment
> mechanism and the trust and confidence of its users.
> Therefore, the NACHA Board resolves and strongly urges
> that all participants implement adequate control systems to
> detect and prevent fraud and abusive financial transactions.

61.    The NACHA Rules apply to and govern every member that chooses to

participate in the ACH Network, and are admittedly structured around the significant

obligations of ODFIs and RDFIs: "The [NACHA] *Rules* are organized around the

types of participants in the ACH Network and acknowledge the major roles played

by originating and receiving financial institutions [and] therefore dedicate[e] large

sections to each of these roles.  **The [NACHA] Rules explicitly recognize that**

**originating financial institutions are the entry points into the ACH Network for**

**corporate users and Third Parties, and that these financial institutions are**

**responsible for those parties' compliance with the [NACHA] Rules**."  NACHA

2013 Operating Rules, Introduction.  The specific responsibilities of ODFIs are

discussed in detail below.

**ODFIs Have Special Duties under NACHA
Operating Rules and Guidelines**

62.   NACHA characterizes ODFIs as "the gatekeepers of the ACH Network."  As the party that enables an Originator – such as an Illegal Payday Lender – to initiate debit entries on the ACH Network, NACHA Operating Rules require an ODFI to enter into an Origination Agreement with each Originator for which it will originate entries on the ACH Network or have an arrangement with a Third-Party Sender that has such an Origination Agreement.  NACHA 2013 Operating Rules, Section 2.2, Subsection 2.2.1.

63.   Under the NACHA Rules, "[a]n ODFI is responsible for all Entries originated through the ODFI whether by an Originator or through a Third-Party Sender  . . . [a]n ODFI is responsible for its Originators' and Third-Party Senders' compliance with these Rules."  NACHA 2013 Operating Rules, Section 2.1.

64.   NACHA Rules require all ODFIs to conduct a risk assessment of their ACH activities, including, *inter alia*, "assessing the nature of risks associated with ACH activity; performing appropriate know-your-customer due diligence; and having adequate management, information and reporting systems to monitor and mitigate risk."  *See* NACHA 2013 Operating Guidelines, Chapter 4 General Rules, p. OG21.

65.   The NACHA Operating Guidelines caution that "ODFIs that choose to originate ACH entries . . . should be aware that both they and their Originators are

subject to the NACHA Operating Rules and applicable U.S. law when transmitting these entries." NACHA 2013 Operating Guidelines, Chapter 3 OFAC Requirements and Obligations, p. OG17.

66.     Section 2.4 of the NACHA Rules provides for "General Warranties and Liabilities of Originating Depository Financial Institutions" and holds that when an ODFI transmits an ACH entry, it is warranting to each RDFI and ACH Operator that, *inter alia*, "the entry has been properly authorized by the Originator and the Receiver in accordance with these Rules." NACHA 2013 Operating Rules Section 2.4, Subsection 2.4.1.1 (a), p. OR7.

67.     With regard to debit entries from consumer accounts (such as those that represent loan repayments to Illegal Payday Lenders), ***an authorization that is "otherwise invalid under applicable Legal Requirements does not satisfy the requirements" of an "authorization" under the NACHA Rules.*** NACHA 2013 Operating Rules Section 2.3, Subsection 2.3.2.3 (b), p. OR6. (emphasis added)

68.     Further, Subsection 2.2.1.1-2 of the NACHA Rules requires ODFIs to enter into a written agreement with every Third-Party Sender or Originator (or merchant) for whom they originate ACH entries. That agreement is to include an "agree[ment] not to originate Entries that violate the laws of the United States;" a "restriction on the types of entries that may be originated" and must include "the right

of the ODFI to audit the Originator's or Third-Party Sender's compliance with the Origination Agreement and these Rules."

69.   ODFIs also have clear duties to "know your customer" and the NACHA Operating Rules make clear that they are intended to reflect that principle.   NACHA 2012 Operating Guidelines, Chapter 3 OFAC Requirements and Obligations, OG13.

70.   On March 14, 2013, NACHA issued an advisory in response to certain negative press reports about collusion of ACH members with payday lenders.   In the release, NACHA reiterated the important policing duties of ODFIs:   "[E]ach ODFI is responsible for the valid authorization of every ACH debit processed in its name . . . In the case of authorizations from consumers, the NACHA Rules are explicit that, among other things, the authorization must 'be readily identifiable as an authorization'; and 'have clear and readily understandable terms.'   *If a purported authorization is invalid under applicable law, it does not meet this standard*."   (Emphasis added).

71.   NACHA went on to say:

> Because of these obligations, as well as associated reputational and other risks, the Federal banking agencies advise that ODFIs should, among other things, (i) exercise appropriate risk-based diligence when bringing on new Originators and Third-Party Senders and (ii) perform appropriate monitoring to determine whether excessive returns or other suspicious patterns of activity warrant further review or more aggressive action.   For example, in 2006 the Office of the Comptroller of the Currency (OCC) released its risk management guidance for ACH activities

by national banks, OCC Bulletin 2006-39, in which it cautioned national banks acting as ODFIs to perform a risk-based evaluation of new Originators, including their historic patterns of unauthorized returns and whether they are engaged in legitimate business activities.

72.    The NACHA Operations Bulletin instructed ACH participants as follows: "ACH participants are strongly encouraged to establish business practices that ensure that ACH transactions do not facilitate illegal activity."

73.    In August 2013, NACHA sent a letter to banks warning them that authorizing access to customer accounts for Illegal Payday Lenders or their Third-Party Senders could violate NACHA rules.  In the letter, NACHA stated that under its rules, "purported authorizations to pay illegal loans that are unenforceable under applicable state law" are not valid.

**ODFIs Have Additional Duties With Regard to Debit Authorizations Purportedly Made Via the Internet under NACHA Operating Rules and Guidelines**

74.    Each entry into the ACH Network is coded pursuant to a NACHA entry code that identifies the type of activity the entry represents.  The ACH Network has at least 23 standard entry codes, and NACHA has identified two specific entry codes that are used by high risk Originators such as Illegal Payday Lenders: "ACH WEB" and "ACH TEL".

75.    For example, under the NACHA Rules, a debit entry to a consumer account originated based on an authorization that is communicated, other than by an

oral communication, from the Receiver to the Originator via the Internet is coded as a "WEB" entry on the ACH transaction record. *See*, *e.g.*, 2013 NACHA Operating Rules Subsection 2.5.17.

76.     The NACHA Operating Rules require that, "[a]n ODFI must perform, or ensure that its Originator or Third-Party Sender performs, the requirements of Subsection 2.5.17.2 (Authorization of WEB Entries) and Subsection 2.5.17.3 (WEB Annual Audit) [see] below before permitting an Originator or Third-Party Sender to initiate a WEB Entry."

77.     With regard to WEB entries, Subsection 2.5.17.4 of the NACHA Operating Rules provides:

> In addition to the other warranties contained within these Rules, an ODFI originating a WEB Entry warrants to each RDFI and ACH Operator that:
>
> (a) *Fraud Detection Systems*.   The Originator has established and implemented a commercially reasonable fraudulent transaction detection system to screen the WEB Entry.
>
> (b) *Verification of Receiver's Identity*.  The Originator has established and implemented commercially reasonable methods of authentication to verify the identity of the Receiver of the WEB Entry.
>
> (c) *Verification of Routing Numbers*.  The Originator has established and implemented commercially reasonable procedures to verify that the routing number used in the WEB Entry is valid.

78.    In addition to the NACHA Operating Rules, with regard to Internet initiated entries, NACHA recommends the following as sound business practices in Chapter 48 *Internet Initiated /Mobile Entries (WEB)* of its Operating Guidelines:

### RESPONSIBILITIES OF ODFIs

#### *Agreements with Originators*

Each ODFI that chooses to transmit WEB entries on behalf of its Originators should make modifications to its agreements with its Originators to address the origination of these entries.  These modifications should address:

- the allocation of liability between the Originator and ODFI for WEB transactions, and

- any specific processing obligations relating to such transactions.

In addition, these agreements should address the procedures, practices, and systems Originators are using to comply with their obligations under the *NACHA Operating Rules* governing WEB entries.  For example, the agreement may need to address the authentication methods and the fraudulent transaction detection systems the Originators are using for WEB entry transactions.  ODFIs may also want to see proof of the Originator's annual data security audit prior to or as a condition of transmitting WEB entries for the Originator.

*****

#### Warranties and Liabilities

In addition to all other ODFI warranties contained within the NACHA Operating Rules, each ODFI that chooses to transmit WEB entries on behalf of its Originators also warrants that:

- Each Originator for which the ODFI transmits WEB entries has employed a commercially reasonable fraudulent transaction detection system to screen the entries;

- Each Originator of WEB entries has employed commercially reasonable methods of authentication to verify the identity of the Receiver;

- Each Originator has taken commercially reasonable steps to verify that routing numbers are valid; and

- Each Originator has conducted an annual data security audit to ensure that the financial information that the Originator obtains from Receivers is protected by security practices that include adequate levels of:

  - physical security to protect against theft, tampering, or damage,

  - personnel and access controls to protect against unauthorized access and use, and

  - network security to ensure secure capture, transmission, distribution, and storage until destruction of financial information.

ODFIs must know their Originators and monitor WEB entries because there are additional risk factors to consider with this type of transaction stemming from the inherent risk of transactions that are conducted in an Internet and non face-toface [sic] environment.

All of these additional warranties should be explicitly addressed in ODFI agreements with Originators because there is a commercially reasonable standard that applies to several of the warranties, ODFIs need to be aware of what procedures, practices, and systems their Originators have deployed to meet these requirements.

**The OCC Has Issued Guidance to All Banks
On Managing the Risks of ACH Activity**

79.     The Office of the Comptroller of the Currency ("OCC") supervises

national banks such as NBCal.

80.     On September 1, 2006, the OCC provided guidance for national banks

and examiners on managing the risks of ACH activity, explaining that "[n]ational

banks may be exposed to a variety of risks when originating, receiving, or processing

ACH transactions, or outsourcing these activities to a third party."

81.     The guidance advised:

**High-Risk Activities**

Banks that engage in ACH transactions with high-risk
originators or that involve third-party senders face
increased reputation, credit, transaction, and compliance
risks.  High-risk originators include companies engaged in
potentially illegal activities or that have an unusually high
volume of unauthorized returns.

Before a bank engages in high-risk ACH activities, the
board of directors should consider carefully the risks
associated with these activities, particularly the increased
reputation, compliance, transaction, and credit risks.  The
board should provide clear direction to management on
whether, or to what extent, the bank may engage in such
ACH activities.  Some banks have established policies
prohibiting transactions with certain high-risk originators
and third-party senders.

82.     In a footnote to the guidance, the OCC made the risk to banks even

clearer, "*[r]isks may include the risk of legal liability* or damage to an institution's

reputation *when originators or third-party senders facilitate or engage in activities that violate criminal laws*." (Emphasis added)

83.     On April 24, 2008, the OCC provided guidance for national banks and examiners on managing the risks of ACH activity initiated by Third-Party Processors, cautioning that:

> Banks should also consider carefully the legal, reputation, and other risks presented by relationships with processors including risks associated with customer complaints, returned items, and potential unfair or deceptive practices. *Banks that do not have the appropriate controls to address the risks in these relationships may be viewed as facilitating a processor's or its merchant client's fraud or other unlawful activity*. (Emphasis added)

84.     The guidance reminded banks that they:

> . . . must implement a due diligence and underwriting policy that, among other things, requires an initial background check of the processor and its underlying merchants to support the validity of the processor's and merchants' businesses, their creditworthiness, and business practices.
>
> *******
>
> By implementing the appropriate controls over processors and their merchant clients, a bank should be able to identify those processors that process for fraudulent telemarketers or other unscrupulous merchants and to ensure that the bank is not facilitating these transactions. In the event a bank identifies fraudulent or other improper activity with a processor or a specific merchant client of the processor, the bank should take immediate steps to address the problem, including filing a Suspicious Activity Report when appropriate, terminating the bank's relationship with the processor, or requiring the processor to cease processing for that specific merchant.

85.     The guidance concludes that:

> The OCC supports national banks' participation in payment
> systems to serve the needs of legitimate processors and the
> customers of such processors and to diversify sources of
> revenue.   However, to limit potential risk to banks and
> consumers, banks should ensure implementation of risk
> management programs that include appropriate oversight
> and controls commensurate with the risk and complexity of
> the activities.  At a minimum, bank programs should verify
> the legitimacy of the processor's business operations, assess
> the bank's risk level, and monitor processor relationships
> for activity indicative of fraud.

**The FDIC Has Issued Guidance to State-Chartered Banks that Enter Into
Payment Processor Relationships with Third Parties**

86.     The Federal Deposit Insurance Corporation ("FDIC") regulates state-
chartered banks and its pronouncements and guidance are closely monitored even by
financial institutions that are regulated by other federal regulators.

87.     On February 25, 2005, the FDIC issued guidance regarding payday
lending and cautioned that such lending raises "significant risks" for banks,
particularly when the payday lenders initiate through Third-Party Senders.  The FDIC
guidance makes clear that:

> The use of third parties in no way diminishes the
> responsibility of the board of directors and management to
> ensure that the third-party activity is conducted in a safe
> and sound manner and in compliance with policies and
> applicable laws.  Appropriate corrective actions, including
> enforcement actions, may be pursued for deficiencies
> related to a third-party relationship that pose concerns

about either safety and [sic] soundness or the adequacy of protection afforded to consumers.

88.    On June 6, 2008, the FDIC issued additional "Guidance for Managing Third-Party Risk" which began by noting that:

An institution's board of directors and senior management are ultimately responsible for managing activities conducted through third-party relationships, and identifying and controlling the risks arising from such relationships, to the same extent as if the activity were handled within the institution.

89.    Among the risks to banks the FDIC identified in its June 6, 2008 "Guidance for Managing Third-Party Risk" was:

Compliance risk.  Compliance risk is the risk arising from violations of laws, rules, or regulations, or from noncompliance with internal policies or procedures or with the institution's business standards.  This risk exists when the products or activities of a third party are not consistent with governing laws, rules, regulations, policies, or ethical standards. For example, some third parties may engage in product marketing practices that are deceptive in violation of Section 5 of the Federal Trade Commission Act . . . Compliance risk is exacerbated when an institution has inadequate oversight, monitoring or audit functions.

90.    Accordingly, the FDIC advises banks to engage in "Due Diligence in Selecting a Third Party":

Following an assessment of risks and a decision to proceed with a plan to establish a third-party relationship, management must select a qualified entity to implement the activity or program.  The due diligence process provides management with the information needed to address qualitative and quantitative aspects of potential third

parties to determine if a relationship would help achieve the financial institution's strategic and financial goals and mitigate identified risks. Not only should due diligence be performed prior to selecting a third party, but it should also be performed periodically during the course of the relationship, particularly when considering a renewal of a contract.

******

Comprehensive due diligence involves a review of all available information about a potential third party, focusing on the entity's financial condition, its specific relevant experience, its knowledge of applicable laws and regulations, its reputation, and the scope and effectiveness of its operations and controls.

91.    On January 31, 2012, the FDIC issued revised guidance describing

potential risks associated with relationships with third-party entities that process

payments for telemarketers, online businesses, and other merchants.  In a footnote to

the guidance, the FDIC provided, "[e]xamples of telemarketing, online businesses,

and other merchants that may have a higher incidence of consumer fraud or

potentially illegal activities or may otherwise pose elevated risk" which included

"payday or subprime loans."

92.    The FDIC advised banks that:

. . .  payment processors that deal with telemarketing and online merchants may have a higher risk profile because such entities have tended to display a higher incidence of consumer fraud or potentially illegal activities than some other businesses.  Given this variability of risk, payment processors must have effective processes for verifying their merchant clients' identities and reviewing their business

33

practices.   Payment processors that do not have such processes can pose elevated money laundering and fraud risk for financial institutions, as well as legal, reputational, and compliance risks if consumers are harmed.

93.    The FDIC made clear that banks faced potential liability if they failed to

adequately manage their relationships  with payment processors:

> Deposit relationships with payment processors expose financial institutions to risks not customarily present in relationships with other commercial customers.   These include increased operational, strategic, credit, compliance, and transaction risks.   In addition, financial institutions should consider the potential for legal, reputational, and other risks, including risks associated with a high or increasing number of customer complaints and returned items, and the potential for claims of unfair or deceptive practices.  ***Financial institutions that fail to adequately manage these relationships may be viewed as facilitating a payment processor's or merchant client's fraudulent or unlawful activity and, thus, may be liable for such acts or practices.***   In such cases, the financial institution and responsible individuals have been subject to a variety of enforcement and other actions. ***Financial institutions must recognize and understand the businesses and customers with which they have relationships and the liability risk for facilitating or aiding and abetting consumer unfairness or deception*** under Section 5 of the Federal Trade Commission Act.  (Emphasis added).

94.    On February 15, 2013, M. Anthony Lowe, Regional Director of the

FDIC's Chicago Regional Office wrote to an Ohio-chartered bank following a

Compliance and Risk Management visitation of that bank after the FDIC became

aware that the bank had been processing transactions on behalf of payday lenders.

The letter set forth the FDIC's position with regard to banks' processing of such transactions  on behalf of payday lenders:

> The focus of our visitation was on the risk associated with this relationship (with a payday lender), compliance with consumer protection laws and regulations, and the effectiveness of Board and senior management due diligence and oversight of this relationship and the corresponding payday lending-related activities.  It is our view that payday loans are costly, and offer limited utility for consumers, as compared to traditional loan products. Furthermore, the [**Redacted**] relationship carries a high degree of risk to the institution, including third-party, reputational, compliance, and legal risk, which may expose the bank to individual and class actions by borrowers and local regulatory authorities.   Consequently, we have generally found that activities related to payday lending are unacceptable for an insured depository institution.

**NBCal Knew the Illegal Payday Lenders Were Engaged In Unlawful Activities**

95.    At the time NBCal originated the entries on the ACH Network referenced herein, it knew the identity of the Illegal Payday Lenders, it knew the lenders were engaged in the business of making payday loans, and it knew the Illegal Payday Lenders were engaged in the business of making payday loans in states where payday lending was unlawful.

96.    According to the NACHA Rules, NACHA represents more than 10,000 financial institutions via 17 regional payments associations and direct membership. Approximately 99% of these banking institutions have never originated entries on the ACH Network at the request of an unlicensed, online payday lender.

97.     In contrast, NBCal was one of the most active originators of ACH WEB and ACH TEL entries on the ACH Network for high risk originators such as online payday lenders.   NBCal originated entries on the ACH Network at the request of payday lenders because it could charge payday lenders higher fees to originate high-risk payday loans entries than are customarily paid for originations on the ACH Network by legitimate originators.   NBCal charged these higher fees because it knew the transactions it was originating were illegal.

98.     The higher origination fees charged to the payday lenders reflected the calculated risk NBCal took knowingly to assist "high-risk" originators like Illegal Payday Lenders in violating the laws of the banned states, the NACHA Rules, and OCC and FDIC guidelines.   The overwhelming majority of ODFIs on the ACH Network refused to originate entries on behalf of these same Illegal Payday Lenders.

99.     Without direct, unilateral access to borrowers' bank accounts provided by ODFI banks willing to abandon their "gatekeeper" responsibilities to guard the secure ACH Network, the Illegal Payday Lenders would need borrowers to take an affirmative step such as writing and mailing a check for each loan repayment. Borrowers that find lenders' demands for repayment to be inconsistent with their respective understandings of their loan agreements would have an opportunity—before money is unilaterally taken from their bank accounts by the ODFI banks "originating" the debit entries requested by the lenders—to question, reject, or

dispute the demand for payment.  The FTC has warned consumers about this practice and sued certain payday lenders for engaging in similar conduct.[6]

100.   Characteristics of Illegal Payday Lender transactions themselves also notified ODFIs of unlawful activity.

101.   Whether ODFIs contract with Illegal Payday Lenders or their Third-Party Senders, ACH debits originated at the request of Illegal Payday Lenders inevitably raise "red flags" to ODFIs which alert them to the fact that potential unlawful activity is occurring.

102.   Chief among these "red flags" are high return rates on ACH debit transactions.  An ACH debit transaction may be returned for numerous reasons including, *inter alia*, the account to be debited having insufficient funds or the account owner claiming the debit was not authorized.

103.   ACH debits originated at the request of the Illegal Payday Lenders far exceed the return rate for all electronic payments of less than 1%.  Although high-return rates alerted ODFIs of potential illegal activity, NBCal ignored these warnings—not only because it already knew the business of the Illegal Payday Lenders through its required due diligence obligations, but also because the ODFIs

---

[6] <https://www.consumer.ftc.gov/articles/0249-online-payday-loans> (last visited on December 16, 2014).

charge fees on every return payment made by the Originator. Thus, they can potentially reap twice the profit in fees associated with unauthorized payments.[7]

104. In addition to NACHA Rules discussing the importance of investigating high return rates (*see* 2013 NACHA Rules, subsection 2.17.2.2 "ODFI Reduction of Return Rate"), the banking industry has been informed that high rates of returned transactions – regardless of the specific reason for the return – indicate suspicious activity. As noted by the Financial Crimes Enforcement Network of the U.S. Department of the Treasury ("FinCEN"):

> *Fraud*: High numbers of consumer complaints about Payment Processors and/or merchant clients, and particularly **high numbers of returns or chargebacks (aggregate or otherwise)**, suggest that the originating merchant may be engaged in unfair or deceptive practices or fraud, including using consumers' account information to create unauthorized RCCs or ACH debits.

*FinCEN Advisory: Risk Associated with Third-Party Payment Processors*, FIN-2012-A010 (October 22, 2012) (emphasis added).

---

[7] For example, between 2003 and 2006, Wachovia Bank collected millions of dollars in origination fees by debiting funds for fraudulent telemarketers. The OCC asserted that some of the bank's officials knew about the deceptive telemarketing practices but failed to take quick action to resolve the problem because high-return rates alone netted Wachovia $1.45 million in return item fees. Ultimately Wachovia agreed to pay over $150 million in restitution to defrauded consumers, a $10 million civil money penalty and $8.9 million in contributions to consumer education.

105.   NBCal knowingly ignored the nature of the Illegal Payday Lenders' business, ignored their usage of entry codes that are known to be used by high risk Originators such as Illegal Payday Lenders: ACH WEB and ACH TEL, and ignored excessively high-return rates and charge backs in order to turn extra profit.

### FACTS AS TO PLAINTIFF JESSICA PARM

106.   On or about April 18, 2013, Plaintiff received a payday loan from Western Sky/CashCall in the amount of $1,000.  The finance charge on the loan was $3,831.06.  The entirety of the interest plus principal, which equaled $4,831.06, was scheduled to be paid over the course of 25 months.  Thus, the nominal annual interest rate on the loan was 233.71%, with a monthly interest rate of 19.48%.

107.   On or about May 3, 2013, Western Sky/CashCall initiated a debit transaction of $74.50 from Plaintiff Parm's checking account in Georgia through the ACH Network. The $74.50 payment was applied solely to interest and did not reduce the amount of Plaintiff Parm's $1,000.00 debt.  The ODFI originating this transaction was NBCal.

108.   On or about June 3, 2013, Western Sky/CashCall initiated a debit transaction of $198.19 from Plaintiff Parm's checking account in Georgia through the ACH Network. Of this amount, $186.25, the majority of the payment, was applied to interest and only $11.94 was applied toward the amount of Plaintiff Parm's $1,500.00 debt.  The ODFI originating this transaction was NBCal.

109.   NBCal derived a benefit through the receipt of fees for its origination of debit entries on the ACH Network initiated by Western Sky/CashCall (or Third-Party Senders acting on their behalf) and received by Plaintiff.

## CLASS ACTION ALLEGATIONS

110.   <u>Description of the Class and Sub-Class</u>:  Plaintiff brings this class action on behalf of herself and a Class and Sub-Class defined as follows:

    i.    All natural persons within the states of Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia whose accounts were debited via an ACH entry originated by NBCal as an ODFI on behalf of an Illegal Payday Lender in repayment of a loan which was illegal under the law of their respective state at the time of the debit and whose loan agreement(s) provided that borrowers consent to the arbitration of disputes by a tribal arbitral forum (the "Class").

    ii.    All natural persons within the state of Georgia whose accounts were debited via an ACH entry originated by either NBCal as an ODFI on behalf of an Illegal Payday Lender in repayment of a loan which was illegal under Georgia law at the time of the debit and whose loan agreement(s) provide(s) that borrowers consent to the arbitration of disputes by a tribal arbitral forum (the "Sub-Class").

111.   Excluded from the Class and Sub-Class are Defendant's officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns.  Also excluded from the Class and Sub-Class is any judge, justice or judicial

40

officer presiding over this matter and the members of their immediate families and judicial staff.

112.   <u>Numerosity</u>:   The proposed Class and Sub-Class are so numerous that individual joinder of all members is impracticable.

113.   <u>Common Questions of Law and Fact Predominate</u>:   There are many questions of law and fact common to Plaintiff and the Class and Sub-Class, and those questions substantially predominate over any questions that may affect individual Class and Sub-Class members.   Common questions of fact and law include (a) whether payday loans are usurious and unenforceable under state or federal law; (b) whether debts owed to payday lenders are incurred in connection with the business of lending money at an usurious rate; (c) whether the usurious rate was at least twice the enforceable rate under the law of the states in which class members reside; (d) whether NBCal's collection of the illegal or unenforceable debt was made with actual or constructive knowledge of the illegality of the loans; (e) whether NBCal's collection of the illegal debt was the proximate cause of the Class and Sub-Class's injuries; (f) whether the Class and Sub-Class suffered an injury to property by the debiting of their accounts by NBCal; and (g) should the running of the statute of limitations for the Class and Sub-Class's claims be equitably tolled.

114.   <u>Typicality</u>:  Plaintiff's claims are typical of the claims of the members of the Class and Sub-Class.  Plaintiff and all members of the Class and Sub-Class have been similarly affected by the actions of NBCal.

115.   <u>Adequacy of Representation</u>:   Plaintiff will fairly and adequately represent and protect the interests of the Class and Sub-Class.  Plaintiff has retained counsel with substantial experience in prosecuting complex and class action litigation.  Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class and Sub-Class, and have the financial resources to do so.

116.   <u>Superiority of Class Action</u>:  Plaintiff and the members of the Class and Sub-Class suffered, and will continue to suffer, harm as a result of NBCal's unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.  Individual joinder of all members of the Class and Sub-Class is impractical.  Even if individual class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by NBCal's common course of conduct.  The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all class members' claims in a single

forum.  The conduct of this action as a class action conserves the resources of the parties and of the judicial system, and protects the rights of the class members.

**FIRST CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c) by NBCal**
**(On behalf of the Class and Sub-Class)**

117.   Plaintiff incorporates by reference the preceding paragraphs.

118.   NBCal is a "person" as defined by 18 U.S.C. § 1961(3).

119.   The financial entity participants in the ACH Network are comprised of the following:

a.   "Originators" which include any party that "initiates" entries into the ACH Network pursuant to an Origination Agreement with an ODFI or Third-Party Sender acting on behalf of an ODFI, including Illegal Payday Lenders;

b.   Third Party Service Providers" which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.  A "Third-Party Sender" is a type of Third-Party Service Provider that enters into an agreement with an Originator to "initiate" entries on its behalf and then enters into an Origination Agreement with an ODFI to "originate" the entries initiated by the Third-Party Sender on behalf of the Originator;

  c. "ODFIs" which include all financial institutions participating in the ACH Network that originate ACH entries pursuant to an Origination Agreement with Originators or Third-Party Senders and that agree to abide by the NACHA Rules, including NBCal.

  d. "ACH Operators" which include two central clearing facilities, the Federal Reserve Banks and Electronic Payments Network (EPN), that receive entries from ODFIs and process the entries to the appropriate RDFI; and

  e. "RDFIs" which include all depository financial institutions participating in the ACH Network that receive ACH transaction instructions from ODFIs through the ACH Operator and credit or debit funds to or from its customers' accounts and that are qualified to receive ACH entries and agree to abide by the NACHA Rules.

120. These financial entity participants in the ACH Network constitute an "association-in-fact" enterprise as those terms are used in 18 U.S.C. § 1961(4) (the "ACH Network Enterprise") in that:

  a. Participants in the ACH Network Enterprise share the common lawful and legitimate purpose of facilitating batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

b.  To achieve this common purpose, participants in the ACH Network Enterprise preserve close business relationships and maintain established and defined roles within the enterprise;

c.  The ACH Network Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

121.  The ACH Network Enterprise is an enterprise engaged in, and whose activities, including daily volume batch processing of electronic payments across the United States, affect interstate commerce.  NBCal is associated with the ACH Network Enterprise through its role as an ODFI within the ACH Network Enterprise.

122.  NBCal, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Network Enterprise.  Under the NACHA Operating Rules, NBCal serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through NBCal, whether initiated by an Originator, or by a Third-Party Service Provider acting on the Originator's behalf. NBCal has decision-making authority within the ACH Network Enterprise regarding which Originators and entries to accept into or reject from the ACH Network.

123.  In order to initiate debit entries from borrower checking accounts on the ACH Network, Illegal Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as NBCal, and the

ODFI must originate the ACH debit.  Pursuant to NACHA Rules, when an ODFI originates an ACH entry, it is warranting to each RDFI and ACH Operator that the entry has been properly authorized meaning that it is, *inter alia*, compliant with the NACHA Rules and state and federal laws.

124.   While NBCal shares in the common purpose of the ACH Network and uses the ACH Network to originate lawful and legitimate transactions, NBCal also uses its role within the ACH Network Enterprise to conduct unlawful payday loan debt collection by granting Illegal Payday Lenders access to the ACH Network and "originating" debit entries from the bank accounts of  persons residing in states in which payday lending is illegal "initiated" by the Illegal Payday Lenders (or Third-Party Senders working on their behalf) for the purpose of repaying usurious and illegal loans.  The loans made by Illegal Payday Lenders are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

  a. unenforceable because of state or federal laws against usury;

  b. incurred in connection with the business of lending money at an usurious rate; and

  c. the usurious rate was at least twice the enforceable rate.

125.   NBCal, in its role as an ODFI in the ACH Network Enterprise, originated debit entries on the ACH Network at the request of Illegal Payday Lenders

(or Third-Party Senders acting on the Illegal Payday Lenders' behalf) that NBCal knew routinely violate state law, the NACHA Rules and FDIC and OCC guidelines.

126.   Pursuant to the fraudulent scheme, NBCal participated in the collection of unlawful debts in that:

> a.   Illegal Payday Lenders, or Third-party Senders acting on their behalf, "initiated" debit entries that were subsequently "originated" into the ACH Network by NBCal whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);
>
> b.   NBCal originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);
>
> c.   NBCal knew that the Illegal Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Illegal Payday Lenders in violation of 18 U.S.C. §1962(c).

127.   Accordingly, NBCal has used its gatekeeping role as an ODFI in the ACH Network to directly and indirectly conduct and participate in the conduct of the

affairs of the ACH Network Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

128.   As a direct and proximate result of NBCal's violations of 18 U.S.C. § 1962(c), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by NBCal and such injury was reasonably foreseeable.

## SECOND CLAIM FOR RELIEF
## Violation of 18 U.S.C. § 1962(d) by NBCal
## (On behalf of the Class and Sub-Class)

129.   Plaintiff incorporates by reference the preceding paragraphs.

130.   NBCal and Illegal Payday Lenders, or Third-Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Network Enterprise to facilitate payday loans to borrowers residing in states that banned the practice and collect usurious interest rates in violation of state law.  Their endeavor, if completed, would constitute the collection of "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

    a.    unenforceable because of state or federal laws against usury;

    b.    incurred in connection with the business of lending money at an usurious rate; and

    c.    the usurious rate was at least twice the enforceable rate.

131.   In furtherance of their agreement, NBCal and Illegal Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

      a.     Illegal Payday Lenders (or Third-Party Senders acting on behalf of the Illegal Payday Lenders) agreed to "initiate" ACH debit entries to be originated on the ACH Network by NBCal whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

      b.     NBCal agreed to "originate" ACH debit entries initiated by Illegal Payday Lenders and receive payment for doing so despite their unlawful nature by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

      c.     NBCal knew that the Illegal Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states on behalf of the Illegal Payday Lenders in violation of 18 U.S.C. §1962(c).

132.   Accordingly, NBCal intentionally conspired and agreed with Illegal Payday Lenders to use its gatekeeping role as an ODFI in the ACH Network to

directly and indirectly conduct and participate in the conduct of the affairs of the ACH Network Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

133.   As a direct and proximate result of NBCal and Illegal Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by NBCal and such injury was reasonably foreseeable.

**THIRD CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On behalf of the Class and Sub-Class)**

134.   Plaintiff re-alleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

135.   NBCal in its role as an ODFI, originated debit entries on the ACH Network initiated by Illegal Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

136.   NBCal charged and retained a transaction fee for each debit entry it originated on the ACH Network initiated by Illegal Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

137.   NBCal received and retained wrongful benefits from Plaintiff and the Sub-Class in the form of such transaction fees.

138.   As a result of NBCal's wrongful conduct as alleged herein, NBCal has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Sub-Class.

139.   NBCal's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

140.   It is inequitable for NBCal to be permitted to retain the benefits it received, without justification, from originating debit entries on the ACH Network initiated by Illegal Payday Lenders (or Third-Party Senders acting on the Originator's behalf).   NBCal's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

141.   The financial benefits derived by NBCal rightfully belong to Plaintiff and members of the Sub-Class.   NBCal should be compelled to disgorge in a common fund for the benefit of Plaintiff and members of the Sub-Class all wrongful or inequitable proceeds received from them.   A constructive trust should be imposed upon all wrongful or inequitable sums received by NBCal traceable to Plaintiff and the members of the Sub-Class.

142.   Plaintiff and members of the Sub-Class have no adequate remedy at law.

# FOURTH CLAIM FOR RELIEF
## Aiding and Abetting Violations of Georgia Payday Lending Act
### (On behalf of the Sub-Class)

143.   Plaintiff incorporates by reference the preceding paragraphs.

144.   Pursuant to O.C.G.A. §16-17-2, it is unlawful to engage in any business which consists of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less, unless:

> Such person is engaging in financial transactions permitted pursuant to:
>
> (A) The laws regulating financial institutions as defined under Chapter 1 of Title 7, the "Financial Institutions Code of Georgia";
>
> (B) The laws regulating state and federally chartered credit unions;
>
> (C) Article 13 of Chapter 1 of Title 7, relating to Georgia residential mortgages;
>
> (D) Chapter 3 of Title 7, the "Georgia Industrial Loan Act";
>
> (E) Chapter 4 of Title 7, relating to interest and usury;
>
> (F) Chapter 5 of Title 7, "The Credit Card and Credit Card Bank Act," including financial institutions and their assignees who are not operating in violation of said chapter; or
>
> (G) Paragraph (2) of subsection (a) of Code Section 7-4-2 in which the simple interest rate is not greater than 16 percent per annum;
>
> (2) Such loans are lawful under the terms of:

(A) Article 1 of Chapter 1 of Title 10, "The Retail Installment and Home Solicitation Sales Act";

(B) Article 2 of Chapter 1 of Title 10, the "Motor Vehicle Sales Finance Act"; or

(C) Part 5 of Article 3 of Chapter 12 of Title 44, relating to pawnbrokers;

(3) Subject to the provisions of paragraph (4) of subsection (b) of this Code section, such person is a bank or thrift chartered under the laws of the United States, a bank chartered under the laws of another state and insured by the Federal Deposit Insurance Corporation, or a credit card bank and is not operating in violation of the federal and state laws applicable to its charter; or

(4) Such loan is made as a tax refund anticipation loan. In order to be exempt under this paragraph the tax refund anticipation loan must be issued using a borrower's filed tax return and the loan cannot be for more than the amount of the borrower's anticipated tax refund. Tax returns that are prepared but not filed with the proper government agency will not qualify for a loan exemption under this paragraph.

145.    As set forth more fully above and incorporated by reference herein, the

Illegal Payday Loans made to Plaintiff in Georgia featured a principal amount of less

than $3,000 and neither the Illegal Payday Lender nor the Illegal Payday Loan

qualified for any exception available under O.C.G.A. §16-17-2.

146.     Pursuant to O.C.G.A. §16-17-2(d):

Any person who violates subsection (a) or (b) of this Code section shall be guilty of a misdemeanor of a high and aggravated nature and upon conviction thereof shall be punished by imprisonment for not more than one year or by a fine not to exceed $5,000.00 or both.   Each loan

transaction shall be deemed a separate violation of this Code section.   Any person who aids or abets such a violation, including any arbiter or arbitration company, shall likewise be guilty of a misdemeanor of a high and aggravated nature and shall be punished as set forth in this subsection.

147.   Pursuant to O.C.G.A. § 16-17-3, "[a] civil action under Code Section 16-17-2 may be brought on behalf of an individual borrower or on behalf of an ascertainable class of borrowers."

148.   NBCal aided and abetted the Illegal Payday Lenders' violations of the Georgia Payday Lending Act by providing the necessary access to the ACH Network to carry out the Illegal Payday Lenders' illegal scheme.

149.   In providing the necessary access to the ACH Network to carry out the Illegal Payday Lenders' illegal scheme, NBCal knowingly provided substantial assistance to—and profited from—the illegal lending activities of the Illegal Payday Lenders.

150.   At the time NBCal provided the necessary access to the ACH Network to carry out the Illegal Payday Lenders' illegal scheme, it knew the identity of the Illegal Payday Lenders, including their unlawful activity.

151.   NBCal was prohibited by NACHA Rules from honoring ACH transactions on unlawful payday loans.

152.   NBCal was aware of the illegal nature of the lending activities of the Illegal Payday Lenders through due diligence procedures.

153.   As a result of NBCal's conduct, the Sub-Class was harmed.

154.   As a result of NBCal's knowing participation in the making of illegal payday loans, it is liable as an aider and abettor to the violations of the Georgia Payday Lending Act referenced herein.

**WHEREFORE**, Plaintiff on her own behalf and on behalf of the Class seeks judgment in an amount to be determined at trial but not less than $5,000,000, as follows:

(a)      Under 18 U.S.C. § 1964(c), awarding each  member of Class and Sub-Class damages from NBCal for NBCal's violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their accounts in which NBCal was the ODFI and which represented repayment of a loan from an Illegal Payday Lender, trebled;

(b)      Under 18 U.S.C. § 1964(c), awarding each member of the Class and Sub-Class damages from NBCal for NBCal's violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit from their account in which NBCal was the ODFI and which represented repayment of a loan from an Illegal Payday Lender, trebled;

(c)     Permitting each member of the Class and Sub-Class to recover
damages in restitution *at law* from NBCal consisting of a refund of
every ACH debit from their accounts in which NBCal was the
ODFI and which represented repayment of a loan from an Illegal
Payday Lender;

(d)     Awarding the Sub-Class damages against NBCal for its aiding and
abetting  in the violations of the Georgia Payday Lending Act;

(e)     Awarding Plaintiff attorneys' fees and costs in pursuing this
action; and

(f)     Awarding such other and further relief as this Court deems just,
proper and equitable.

## JURY DEMAND

Plaintiff hereby demands a jury trial in the instant action.

Dated:  December 23, 2014

Respectfully submitted,

**DARREN KAPLAN LAW FIRM, P.C.**

By:   /s/ Darren T. Kaplan
Darren T. Kaplan
(GA Bar No. 172670)
1359 Broadway
Suite 2001
New York, NY 10018

Tel:   (212) 999-7370

Fax:   (646) 390-7410
dkaplan@darrenkaplanlaw.com

**STUEVE SIEGEL HANSON LLP**
Norman E. Siegel, *pro hac vice forthcoming*
Steve Six, *pro hac vice forthcoming*
J. Austin Moore, *pro hac vice forthcoming*
460 Nichols Road, Suite 200
Kansas City, MO 64112

Tel:   (816) 714-7100
Fax:   (816) 714-7101
siegel@stuevesiegel.com
six@stuevesiegel.com
moore@stuevesiegel.com

**KOPELOWITZ OSTROW P.A.**
Jeffrey M. Ostrow, *pro hac vice forthcoming*
Jason H. Alperstein, *pro hac vice forthcoming*
200 S.W. 1st Avenue, 12th Floor
Fort Lauderdale, Florida 33301

Tel:   (954) 525-4100
Fax:   (954) 525-4300
ostrow@KOlawyers.com
alperstein@KOlawyers.com

**TYCKO & ZAVAREEI LLP**
Hassan A. Zavareei, *pro hac vice forthcoming*
Jeffrey D. Kaliel, *pro hac vice forthcoming*
2000 L Street, N.W.
Suite 808
Washington, D.C. 20036

Tel:   (202) 973-0900
Fax:   (202) 973-0950
hzavareei@tzlegal.com
jkaliel@tzlegal.com

*Counsel for Plaintiff and the Class*